STATE OF MAINE
HANCOCK, ss

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. AP-2003-028

ANN T. SCHWARTZ )
)
Petitioner )
)
v. )
)
MAINE UNEMPLOYMENT )
INSURANCE COMMISSION )
)
and )
)
MAINE SEA COAST MISSIONARY )
SOCIETY, )
)
Respondents )

DECISION AND
ORDER

DONALD L. ⬚⬚⬚⬚⬚
LAW ⬚⬚⬚⬚

SEP 8 2004

This matter is before the Court on appeal pursuant to 5 M.R.S.A. §§11001-11008 and Rule 80C of the Maine Rules of Civil Procedure from a decision of the Maine Unemployment Insurance Commission (**herein, "Commission"**), in which the Commission held that Ann T. Schwartz's (**herein, "Claimant"**) former employer, Maine Seacoast Missionary Society (**herein, "Mission"**) is exempt from the Employment Security Law, thereby rendering the Claimant ineligible to collect unemployment benefits. The Claimant filed this appeal.

## Background

The Mission is a non-denominational 501(c)(3) non-profit organization that serves coastal communities in a four-county area from Monhegan / Matinicus to the Canadian border. (R. at 48). The Mission has twenty-five members on its Board of Directors, all of whom are Christian. (R. at 49). Gary DeLong, an ordained minister, is the executive director of the Mission. (R. at 32-33). Prior to working for the Mission, Mr. DeLong was a minister for the First Church of Christ in Massachusetts for twenty-six years. (R. at 32-33). The Mission has twenty-nine staff members, seven or eight of which are ordained members of the clergy. (R. at 12, 126, 163-64). The Mission

1

provides financial and spiritual support and oversight for these island ministers who serve as pastors for island congregations. (R. at 35-36, 45, 111-12). All employees' retirement and healthcare benefits are administered under the United Church of Christ pension plan. (R. at 34).[1]

Since the Mission was first started in 1905, it has provided programs to the community in order to "reach out to show God's love and compassion to marginalized people in the area [the Mission] serve[s]." (R. at 49). The Mission has always been "rooted in an inclusive Christian ministry of compassion and justice," and has never tried to downplay or hide its Christian roots. (R. at 41, 86). More than fifty percent of the Mission's income is from its endowment made up mostly of individual donors. (R. at 44, 62). These individuals are consciously giving to a Christian faith-based organization. (R. at 61). The Mission receives support in the form of money contributions, as well as in-kind support from 96 churches. (R. at 42). The Mission has a voluntary affiliation with the United Church of Christ and the American Baptist Congregation. (R. at 44). The Mission attends and participates in the annual meeting of the United Church of Christ. (R. at 45).

The Mission provides a variety of programs, both religious and secular, to the coastal communities. For instance, the mission owns a boat called the Sunbeam, which provides programs and services to island residents, including the telemedicine program that brings a nurse to the island with equipment to allow island residents to be examined by doctors on the mainland. (R. at 38, 90-91, 116). The Sunbeam also delivers a boat minister to visit the islanders and their pastor, lead worship services, and provide pastoral

---

[1] The only exception is if there is an American Baptist clergy person that the Mission hires for one of the island churches. Under those circumstances the clergy person may maintain their benefits in the American Baptist System.

2

counseling. (R. at 39). The Mission also sponsors an after-school program called the Edge, which operates in Washington County. (R. at 92-93). No religious teaching is conducted in the after-school program. (R. at 57, 60). The Mission also has a used-clothes "recycle shop," and a food pantry. (R. at 117). Mr. DeLong described these programs as being "completely at the very heart of the essence of the religious enterprise." (R. at 42). Mr. DeLong, and many of the employees at the Mission see their work as a form of ministry and believe they are doing the work of the church ("God's work") in serving the social aspect of the community. (R. at 34, 59).

The Mission (as an employer) has never paid unemployment contributions. (R. at 37). The employee handbook distributed on July 1, 2001,[2] erroneously stated that employees were covered for unemployment benefits. (R. at 10, 37). This mistake was corrected in a letter, dated June 5, 2003,[3] to the staff recognizing the Mission's error and stating the handbook was changed to reflect the policy that employees would not be eligible for unemployment benefits because the Mission is a religious organization exempt from the Employment Security Law. (R. at 128).

The Claimant came to work for the Mission in May 2000 as the Director of Development. (R. at 10, 25). The Mission discharged the claimant from employment on December 2, 2002. (R. at 10). The claimant filed an application for unemployment benefits in January 2003, which was administratively denied because the Mission was exempt from paying unemployment contributions. (R. at 10). On the claimant's request, the Tax Division for the Bureau of Unemployment Compensation **(herein, "Tax**

---

[2] The employee handbook was issued approximately one year after the Claimant began working for the Mission.

[3] The Mission notified their employees of this mistake in the employee handbook approximately six months after the Claimant was discharged from her position.

Division") investigated the Mission's status as exempt from paying unemployment contributions. (R. at 12).

In April 2003, Field Supervisor and Examiner Gary McKeen determined that the Mission should not be exempt from unemployment taxation. (R. at 157, 161). The Mission appealed this determination on April 30, 2003. (R. at 152). On May 15, 2003, the Tax Section Manager, Judy Fearing, issued a new determination stating that the Mission was entitled to the exemption allowed for religious organizations. (R. at 148). Accordingly, the Claimant was not monetarily eligible for benefits because she had insufficient wages for insured work. (R. at 279, 309).

The Claimant appealed this determination to the Division of Administrative Hearings. (R. at 275). Following a hearing on July 1, 2003, the Hearing Officer stated that he did not have jurisdiction to rule on a tax determination and confirmed that the Claimant had not earned sufficient wages to be eligible for benefits. (R. at 279-281, 291).

The Claimant appealed this decision to the Commission. (R. at 303). Following a hearing at which the Claimant and the Mission appeared on July 14, 2003, the Commission issued a decision upholding the Mission's exemption from unemployment taxation and the determination that the Claimant is ineligible for benefits due to insufficient wages.[4] (R. at 1-4). The claimant appealed this decision to this Court.[5]

---

[4] Specifically, the Commission found that the Mission did not meet the definition of an "employer" under the Employment Security Law because the Mission was (1) operated primarily for religious purposes; (2) a church organization; and (3) principally supported by a church or convention or an association of churches. (R. at 3-4).

[5] At the outset the claimant argues that the testimony of the executive director of the Mission, Gary DeLong, was improper unsworn testimony, which is fatal to the Commissioner's decision. The basis of the Petitioner's assertion is on page 8 of the record, which describes Mr. DeLong as being "nonresponsive" to the Commission Chairman's request to taking the oath.

## Discussion

### A. Standard of Review

In reviewing a decision of the Maine Unemployment Insurance Commission, this Court reviews the administrative record to determine whether the Commission's findings are supported by the record and whether the Commission has correctly applied the law. McPherson v. Maine Unemployment Insurance Commission, 1998 ME 177, ¶6, 714 A.2d 818. The scope of judicial review of an administrative agency's factfinding is strictly limited; such a finding may be overturned only upon a showing by a challenger that it was "unsupported by substantial evidence on the whole record." Clarke v. Maine Unemployment Insurance Commission, 491 A.2d 549, 552 (Me., 1985) (citation omitted). "This standard of review of an administrative finding of fact is identical to the 'clear error' standard used by the Law Court." Id. (quoting Gulick v. Board of Environmental Protection, 452 A.2d 1202, 1207-08 (Me. 1982)). The reviewing court must examine the entire record to determine whether on the basis of all the testimony and exhibits before the agency it could fairly and reasonably find the facts as it did. Clarke, 491 A.2d at 551 (citing In re Maine Clean Fuels, Inc., 310 A.2d 736, 741 (Me. 1973)). The court will not substitute its judgment for the Commission's where there may be a reasonable difference of opinion. Clarke, 491 A.2d at 552 (citing Seven Islands Land Co. v. Maine Land Use Regulation Commission, 450 A.2d 475, 479 (Me. 1982)).

The Commission provided an affidavit of the Commission Chairman, John B. Wlodkowski, affirming that Mr. DeLong agreed to take the oath to give truthful testimony. It is likely that the recording equipment simply failed to record Mr. DeLong's response. The Chairman stated that he would not have proceeded with the hearing without Mr. DeLong taking the oath or affirming his testimony.

The Court finds that the Commission properly relied on Mr. DeLong's testimony in making its decision. See Sewall v. Spinney Creek Oyster Co., 421 A.2d 36, 40 (Me. 1980) (noting cases where courts have found that it was not clear from the record that there was a failure to swear a witness, and therefore the regularity of proceedings is presumed).

In an 80C appeal, the court must determine whether the Commission abused its discretion, committed error of law, or made findings not supported by substantial evidence in the record. McGhie v. Town of Cutler, 2002 ME 62, ¶5, 793 A.2d 504. Substantial evidence is evidence that a reasonable mind would accept as sufficient to support a conclusion. Bath Iron Works v. Maine Unemployment Insurance Commission, docket no. AP-01-066 (Me. Super. Ct., June 17, 2002) (*Crowley, J.*).

## B. Applicable Law.

### *1. Legal Background of the Employment Security Law.*

The United States Government imposes a tax on certain classes of employers. *See* 26 U.S.C. §§ 3301-3311. In the Federal Unemployment Tax Act (**herein, "FUTA"**), Congress has authorized a cooperative federal-state scheme to provide benefits for unemployed workers. FUTA requires employers to pay an excise tax on wages paid to employees in "covered" employment, but entitles them to a credit of up to 90% of the federal tax for contributions they have paid into federally approved state unemployment compensation programs. *See* 26 U.S.C. §§ 3301-3302. One of the requirements for federal approval is that the state programs cover certain broad categories of employment.

Until 1970, 26 U.S.C. §3306(c)(8) excluded from the definition of covered employment "service performed in the employ of a religious, charitable, educational, or other [tax exempt] organization." California v. Grace Brethren Church, 457 U.S. 393, 397 (1982) (citation omitted). As a consequence, such organizations were not required to pay either federal excise taxes or state unemployment compensation taxes. In 1970, Congress amended FUTA to require state programs to cover employees of nonprofit organizations, state hospitals, and state institutions of higher education, thus eliminating

the broad exemption available to non-profit organizations. Id. at 397 (citing Employment Security Amendments of 1970). At the same time, Congress enacted 26 U.S.C. §3309(b) to exempt from mandatory state coverage a narrow class of religious and educational employees. To maintain compliance with FUTA, the States promptly amended their corresponding state programs.

The language of the Maine Employment Security Law mirrors provisions in the FUTA. Since the Federal and State statutes compromise a single scheme, the construction of the State law should be consistent with that of its federal counterpart. Bethania Association v. Jackson, 635 N.E.2d 671, 674 (Ill. App. Ct., 1994) (citations omitted).

### 2. Maine's Employment Security Law.

To be eligible under the Maine Employment Security Law to receive unemployment benefits, the claimant must have earned wages for "insured work." 26 M.R.S.A. §1192(5). "Insured work" is defined in the statute as "employment by employers." 26 M.R.S.A. §1043(15). "Employment" is defined broadly by the statute to include services "performed for wages or under any contract of hire, written or oral, expressed or implied." 26 M.R.S.A. §1043(11).

The statute, 26 M.R.S.A. §1043(11)(F)(21)(a), goes on to provide exemptions from the definition of employment, including "services performed in the employ of a church." 26 M.R.S.A. §1043(11)(F)(21)(a),[6] and its Federal counterpart, 26 U.S.C.

---

[6] §1043(11)(F) provides the term employment shall not include:
    (21) Service performed in the employ of any organization which is excluded from the term "employment" as defined in the Federal Unemployment Tax Act solely by reason of section 3306(c)(7) or (8) if:
    (a) Service performed in the employ of a church or convention or association of churches, or an organization which is operated primarily for religious purposes and which is operated,

§3309(b)(1)(B),[7] require that organizations separately incorporated from a church, like the Mission, operate "primarily for religious purposes" and be "operated, supervised, controlled, or principally supported by a church or convention or association of churches" in order to qualify for exemption from unemployment compensation taxes.

As a general rule, exemptions to unemployment taxation are strictly construed. Outdoor World Corp. v. Maine Unemployment Ins. Comm'n, 542 A.2d 369, 372 (Me. 1988) (applying the real estate brokers or salesperson exemption, 26 M.R.S.A. §1043(11)(F)(19)) (citations omitted); see also Bethania Association, supra, 635 N.E.2d at 674-75 (stating the unemployment compensation act is remedial in nature and exemption provisions must be strictly construed with uncertainties resolved in favor of inclusion). In the case of exemptions for religious organizations, however, courts apply a more expansive reading for exemptions: "'[T]he rule of strict construction is superseded in instances where there is a strong possibility that the statute in question infringes upon a parties' right to free exercise of religion.'" Kendall v. Director of the Division of Employment Security, 473 N.E.2d 196, 199 (Mass. 1985) (quoting Christian School Ass'n v. Commonwealth Dept of Labor & Indus., 423 A.2d 1340, 1344 (Pa. 1980)).

### a. The Mission is Not a "Church" for Purposes of 26 M.R.S.A. §1043(11)(F)(21)(a).

Neither Maine's Employment Security Act nor its Federal Counterpart defines the term "church" contained in §1043(11)(F)(21)(a). This is an issue of first impression in

---

supervised, controlled or principally supported by a church or convention or association of churches[.]

[7] §3309(b) provides that the States are not required to provide coverage of services performed for nonprofit organizations:

(1) in the employ of (A) a church or convention or association of churches, (B) an organization which is operated primarily for religious purposes and which is operated, supervised, controlled, or principally supported by a church or convention or association of churches . . . .

Maine. The Commission secondarily found that the Mission is a church organization, in and of itself.[8]

In St. Martin v. South Dakota, 451 U.S. 772 (1981), the Supreme Court confronted the question of whether a church-run school qualified as a "church" for the purposes of a South Dakota statute (S.D. Codified Laws §61-1-10.4) that is identical to the statute before this Court. The Supreme Court held that the word "church" refers "to the congregation or hierarchy itself, that is, the church authorities who conduct the business of hiring, discharging, and directing church employees." St. Martin, supra, 451 U.S. at 784. The Court went on further to state that "the word 'church' in 26 U.S.C. §3309(b) must be considered as the 'employer,' and not as a building that is a house of worship. . . ." Id. at 784, n. 15.

The Court reasoned that since the school was not separately incorporated from the church, the church employed the school's employees. St. Martin, supra, 451 U.S. at 785. The Supreme Court found that Congress intended a distinction between churches and association of churches, and separately incorporated organizations. Id. at 778-79; see also Bethania Association, supra, 635 N.E.2d at 778. Separately incorporated organizations are subject to the dual requirements of the second prong of the exemption provision while churches and associations are exempt without qualification under the first

---

[8] The Commission relied on the following facts (R. at 4) :
Employer's Exhibit No. 1 states that the Mission has 29 staff members, eleven of which are in an administrative capacity. However, eight of the Mission's staff members are clergy, who have been drawn from the Baptist and congregational traditions. The executive director, who five years ago joined the Mission after spending the previous 14 years as a senior minister at another church, credibly testified that his reason for joining the Mission was that he "wanted it to be an active ministry." Further, the executive director's ministry at the Mission has been fully authorized as a ministry of Maine Conference of the United Church of Christ.

prong of the provision.  Bethania Association, supra, 635 N.E.2d at 778-79 (citing St. Martin, supra, 451 U.S. at 782).

The St. Martin case makes it clear that incorporation is a highly significant fact in determining which prong of the exemption provision is applicable to our analysis of whether the Mission is exempt.  Bethania Association, supra, 635 N.E.2d at 779 (citing St. Augustine's Center for American Indians, Inc. v. Department of Labor, 449 N.E.2d 246, 248 (Ill. App. Ct. 1983) (applying the second prong to a separately incorporated religious organization)).  This Court's analysis does not require a statutory definition of a "church" because the Mission is a distinct legal entity.  Although the Mission has a voluntary affiliation with the United Church of Christ and the American Baptist Congregation, it is still a separate legal entity.  The Mission is a non-denominational 501(c)(3) non-profit organization.

Furthermore, in reference to section 3309(b)(1)(A) of the FUTA,[9] the House Report offers further guidance with the following explanation:

> This paragraph excludes services of persons where the employer is a church or convention or association of churches, but does not exclude certain services performed for an organization which may be religious in orientation unless it is operated primarily for religious purposes and it is operated, supervised, controlled, or principally supported by a church (or convention or association of churches).  Thus, the services of a janitor of a church would be excluded, but services of a janitor for a separately incorporated college, although it may be church related, would be covered.  A college devoted primarily to preparing students for the ministry would be exempt, as would a novitiate or a house of study training candidates to become members of religious orders.  On the other hand, a church related (separately incorporated) charitable organization (such as, for example, an orphanage or a home for the aged) would not be considered under this paragraph to be operated primarily for religious purposes.

---

[9] The Court notes that the Supreme Court in St. Martin expressly limited its decision to the first prong of the exemption provision. See St. Martin, 451 U.S. at 783 (stating "[b]ecause we hold petitioners exempt under §3309(b)(1)(A), we leave the issue of coverage under §3309(b)(1)(B) for the future.").

St. Martin, supra, 451 U.S. at 781 (*quoting* H.R. Rep. No. 91-612, p. 44 (1969)).

Accordingly, the Court finds that the Commission committed an error of law in finding that the Mission is a church organization and exempt from employer contributions under the first prong of section 1043(11)(F)(21)(a).[10] If the Mission is exempt, its exemption must be based on the second prong.[11]

### b. The Mission is Operated Primarily for Religious Purposes and it is Principally Supported by an Association of Churches.

#### 1) Religious Purpose.

---

[10] The Commission and the Mission relied on the legal analysis as laid out in <u>Nampa Christian Schools Foundation, Inc.</u> v. <u>Department of Employment</u>, 719 P.2d 1178 (Idaho 1986), for its determination that the Mission constitutes a church organization. The Court in <u>Nampa</u> applied factors considered by the Eighth Circuit in <u>Lutheran Social Service of Minnesota v. United States</u>, 758 F.2d 1283, 1286-87 (8th Cir. 1985), in defining the term "church" for purposes of a statute that dealt with information that must be filed by tax-exempt organizations. The Eight Circuit stated that what is and is not a church is dependent on a consideration of the following factors:

> (1) A distinct legal existence; (2) a recognized creed and form of worship; (3) a definite and distinct ecclesiastical government; (4) a formal code of doctrine and discipline; (5) a distinct religious history; (6) a membership not associated with any church or denomination; (7) an organization of ordained ministers; (8) ordained ministers selected after completing prescribed studies; (9) a literature of its own; (10) established places of worship; (11) regular congregations; (12) regular religious services; (13) Sunday schools for religious instruction of the young; [and] (14) schools for the preparation of its ministers.

<u>Lutheran Social Service of Minnesota</u>, supra, 758 F.2d at 1286-87 (citations omitted). The Supreme Court of Idaho stated that the facts of each case are to be considered in their respective contexts and considered in light of the above factors. <u>Nampa Christian Schools Foundation</u>, supra, 719 P.2d at 1182 (applying the factors and finding that Nampa Christian was not a "church" for the purposes of Idaho's unemployment compensation statute).

Even if this Court were to engage in this analysis, the Court is convinced that the Mission would still not qualify as a "church" for purposes of the first prong of section 1043(11)(F)(21)(a). The purpose behind the Mission is not so much to declare a specific body of doctrine, as it is to provide programs to the community to marginalized people in the area the Mission serves. Likewise, there is no evidence in the record of a definite ecclesiastical government nor of a membership unassociated with other churches. Although, the Mission does have ordained ministers of the clergy on its staff, the fact is the Mission remains nondenominational.

[11] The Claimant indicates throughout her brief that the fact the Mission is given status under the Federal and State income tax statutes is controlling (or at least relevant) in determining whether the Mission is entitled to an exemption under Maine's Employment Security Law. The Court finds that exemption status from income tax is not conclusive as to unemployment exemption. *See* <u>Concordia Association v. Ward</u>, 532 N.E.2d 411, 414 (Ill. App. Ct. 1988) (citation omitted).

The second prong of 26 M.R.S.A. §1043(11)(F)(21)(a) contains two requirements, the first of which, requires that organizations separately incorporated from a church, like the Mission, operate "primarily for religious purposes" in order to qualify for exemption from unemployment compensation taxes. The Commission found that the Mission satisfies this statutory requirement because its programs are done for religious purposes and are a part of the Mission's essential function of performing what it calls "God's work" in providing care and services to the more marginalized members of society. (R. at 3). The Petitioner argues that the Legislature intended to focus on the *activities* of an organization, rather than the organization's motivation or purpose for the activities, in determining whether the Mission is "operated primarily for religious purposes." *See* Petitioner's Brief, pp. 9-20.

The Law Court has long recognized that absent ambiguous phrasing, the Court does not need to look beyond the plain language of the statute when the legislative intent is clear from the statute. Cook v. Lisbon School Committee, 682 A.2d 672, 676 (Me. 1996). In this Court's process of construing the meaning of the primary purpose limitation with organizational entities incorporated separately but religiously motivated, the Supreme Court has provided some guidance. Terwilliger v. St. Vincent Infirmary Medical Center, 804 S.W.2d 696, 698 (Ark. 1991) (*citing* Lemon v. Kurtzman, 403 U.S. 602 (1971). With reference to separate parochial schools the Supreme Court in Lemon v. Kurtzman, noted that church related schools have a "significant religious mission and that a substantial portion of their activities is religiously oriented." 403 U.S. 602, 616 (1971). In Meek v. Pittenger, 421 U.S. 349, 365-66 (1975), the Supreme Court stated:

> [I]t would simply ignore reality to attempt to separate secular educational functions from the predominantly religious role performed by many . . . church-related . . . schools . . . .

> [R]eligion is so pervasive that a substantial portion of its functions are subsumed in the religious mission.

"In recognition of the religious orientation of even separately incorporated entities courts have routinely exempted religious schools." Terwilliger, supra, 804 S.W.2d at 630 (*citing* Nampa Christian Schools Foundation, Inc. v. State, 719 P.2d 1178 (Idaho 1986)).

Where the religion pervades the operation of the organization, exemption of the organization as one operated primarily for a religious purpose may be had. Unlike the cases cited by the Petitioner, the Commissioner found and this Court agrees that the evidence did establish that. The evidence in the record makes it clear that the Mission is operated primarily for religious purposes.

The Mission provides a variety of programs, both religious and secular, to the coastal communities. For instance, the mission owns a boat called the Sunbeam, which provides programs and services to island residents, including the telemedicine program that brings a nurse to the island with equipment to allow island residents to be examined by doctors on the mainland. (R. at 38, 90-91, 116). The Sunbeam also delivers a boat minister to visit the islanders and their pastor, to lead worship services, and to provide pastoral counseling. (R. at 39). Mr. DeLong described these programs as being "completely at the very heart of the essence of the religious enterprise." (R. at 42). Mr. DeLong, and many of the employees at the Mission see their work as a form of ministry and believe they are doing the work of the church ("God's work") in serving the social aspect of the community. (R. at 34, 59). Since the Mission was first started in 1905, it has provided programs to the community in order to "reach out to show God's love and

13

compassion to marginalized people in the area [the Mission] serve[s]." (R. at 49). The Mission has always been "rooted in an inclusive Christian ministry of compassion and justice," and has never tried to downplay or hide its Christian roots. (R. at 41, 86).

The Court's review of the Mission's intent and operations reveals that it is an organization with a religious mission and purpose. *See* Kendall v. Division of Employment Security, 473 N.E.2d 196, 198-99 (Mass. 1985) (stating, "the fact that the religious motives of the Sisters of St. Francis of Assisi also serve the public good by providing for the education and training of the mentally retarded is hardly reason to deny the Center a religious exemption."). Accordingly, the Court finds the Mission qualifies as an organization "operated primarily for religious purposes."

### 2) The Mission is Principally Supported by an Association of Churches.

The second requirement for exemption under the second prong of 26 M.R.S.A. §1043(11)(F)(21)(a) is that the employer be operated, supervised, controlled or principally supported by a church." The Commission found that the Mission is principally supported by a church, convention, or association of churches. (R. at 4). Substantial evidence exists on the record supporting the Commission's findings.

More than fifty percent of the Mission's income is from its endowment made up mostly of individual donors. (R. at 44, 62). These individuals are consciously giving to a Christian faith-based organization. (R. at 61). The Mission receives support in the form of money contributions, as well as in-kind support from 96 churches. (R. at 42). The Mission has a voluntary affiliation with the United Church of Christ and the American Baptist Congregation. (R. at 44). The Mission attends and participates in the annual meeting of the United Church of Christ. (R. at 45).

The Petitioner argues that because only a small fraction of the Mission's revenue comes from local churches, the Mission is not "principally supported" by these churches. The Petitioner's argument is unpersuasive. Even if the Court were to accept the Petitioner's argument, financial support alone is not the governing factor:

> The statutory language [of the exemption] does not require a church's or group of churches' support to be *financial* in order for that to be recognizable under the statute. The statute merely states "support." While a contribution of money is a strong indicia of one's support, it cannot be held, statutorily, to be the *only* way in which to support an organization. There is no logical reason to differentiate between the types of support an organization may receive. Likewise, there is no statutory command to do so. The key is the *quality* of the support.

Nampa Christian Schools Foundation, Inc., supra, 719 P.2d at 1184 (finding Nampa Christian could not exist as a private school without the moral support of several churches).

Not only is the Mission supported financially by 96 different churches, but it also receives in-kind support from these churches in many different forms, such as the donation of Christmas gifts for people in the community the Mission serves. Mr. Delong gave the following testimony in reference to the $26,000.00 donated to the Mission by 96 different churches:

> If you could go to the Wells Congregational Church about now, you [would] see a huge dory in their fellowship hall. It starts to get filled up with very fine brand new expensive Christmas gifts until its overflowing and then on a day just before Christmas several vans arrive from that Church. They show up as one line in this annual report – Wells Congregational Church; but if you knew the level of interest, the level of caring, that goes into filling that dory with Christmas gifts for kids that don't have much, you would think it was a pretty significant piece of, of support.

(R. at 43). Such support is necessary for the religious organization's continued operation. Substantial and competent evidence is in the record to support that finding. Accordingly,

15

the Court affirms the Commission's decision that the Mission is not required to pay unemployment taxes under 26 M.R.S.A. §1043(11)(F)(21)(a).

## CONCLUSION

For the foregoing reasons, the Court affirms the Commission's decision that the Mission is not required to pay unemployment taxes under 26 M.R.S.A. §1043(11)(F)(21)(a).

Accordingly, the entry is:

Appeal **DENIED**. Decision of the Maine Unemployment Insurance Commission **AFFIRMED**.

The Clerk may incorporate this Decision and Order into the docket by reference.

DATED: August 24, 2004

_____
Justice, Maine Superior Court

FILED &
ENTERED

AUG 2 5 2004

SUPERIOR COURT
HANCOCK COUNTY

16